79 A.2d 606 (1951)
SANDLER
v.
SCHENLEY INDUSTRIES Inc., et al.
Court of Chancery of Delaware, New Castle.
March 13, 1951.
*607 William Marvel (of Morford, Bennethum, Marvel & Cooch), of Wilmington, for plaintiff.
Aaron Finger (of Richards, Layton & Finger), of Wilmington, and George W. Whiteside, Charles Pickett and Alan S. Kuller, of New York City, for defendant Schenley Industries, Inc.
Howard Duane, of Wilmington, and Irving M. Gruber, of New York City, for defendant John L. Leban.
WOLCOTT, Chancellor.
The plaintiff is the owner of 83 out of a total of 4,500,000 shares of capital stock of Schenley Industries, Inc., a Delaware corporation (hereinafter called "Schenley"). The action is brought to enjoin Schenley from carrying out the provisions of a contract to sell 20,000 shares of its stock to John L. Leban (hereinafter called "Leban").
In order to dispose of the motion for preliminary injunction it is necessary to state the facts as they appear from the pleadings and affidavits. The legality of the contract under attack cannot be passed upon except in the light of the facts surrounding and leading up to it.
The business of Schenley and its subsidiaries is the sale of distilled spirits, pharmaceuticals, wines and beer. It is the second largest seller of distilled spirits in the United States and in its last fiscal year had total sales in excess of $500,000,000. The sale of distilled spirits comprised over 75% of Schenley's total sales and a larger percentage of its net profits of over $36,000,000. Leban is the operating head of Schenley's sale of distilled spirits business.
Leban has had 30 years experience in sales promotion. He was first employed by Schenley in 1935 and remained with it until 1943, at which time he was General Sales Manager. Throughout this period, his salary increased from $18,000 to a total compensation including bonus in 1942 of $54,200.
In 1943, he decided to go into the liquor business for himself and, in July of that year, left Schenley's employ to enter the wholesale liquor business in which he remained until October, 1947. He acquired interests in and managed wholesale liquor houses in Georgia and South Carolina, deriving income from them throughout that period of from $150,000 to $250,000 a year.
In October, 1947, Leban returned to Schenley's employ as a result of negotiations between him and Louis S. Rosenstiel, the Chairman of the Board of Schenley, its former president and its largest individual stockholder. Rosenstiel had a thorough knowledge of Leban's abilities and he desired his return to Schenley because, in his judgment, Leban was the type of executive needed for the best interests of Schenley's business. Leban, however, was unwilling to leave his wholesale liquor business and return to Schenley as a mere salaried employee, but was willing to return if it could be arranged for him to acquire a proprietary interest in the business. He, accordingly, asked for an option to purchase Schenley stock as a condition of his return to Schenley's employ. Rosenstiel, while willing for Leban to acquire a substantial stock interest in Schenley, was opposed to an option arrangement. He insisted that Leban be committed to the purchase of whatever stock interest he was to acquire. Leban did not object to this. Rosenstiel also was equally insistent that Leban dispose of his interest in the wholesale liquor business in which he was then engaged, but Leban was unwilling to do this until he was assured of an interest in the Schenley business.
The final result of these negotiations, culminating in Leban's return to Schenley, was that Leban agreed to take no active part in the management of his wholesale liquor business until such time as he had acquired a proprietary interest in Schenley, at which time he agreed to dispose of his interest. Rosenstiel, on his part, agreed to use his best efforts to arrange for the purchase by Leban of a substantial block of Schenley stock after his return to Schenley's employ.
Leban returned to Schenley in October, 1947, and was made a vice-president and a director. At the end of 1948, he was made president of Schenley Distillers, Inc., *608 the subsidiary of Schenley conducting Schenley's business of sales of distilled spirits. Leban is the active head of this subsidiary.
In 1948 and 1949, Leban periodically raised the question of his acquisition of a stock interest in Schenley. He discussed this matter with Rosenstiel and with George D. Woods, a director but not an officer of Schenley and the president of a substantial Schenley stockholder. Both Woods and Rosenstiel recognized that Leban was dissatisfied because of the lack of opportunity for him to acquire Schenley stock. The discussions were broken off in 1949 because of the illness of Rosenstiel. Early in 1950, Leban informed Rosenstiel that he intended to leave the employ of Schenley and return to his wholesale liquor business because of the failure to afford him an opportunity to acquire Schenley stock. On Rosenstiel's assurances that it should be possible to work out an arrangement, Leban agreed to postpone his decision to leave Schenley.
In May, 1950, Schenley purchased 113,000 shares of its stock and, in June, negotiations for the purchase by Leban of Schenley stock were renewed. These negotiations culminated on June 27, 1950 at a meeting of Schenley's Board of Directors at which Rosenstiel recommended that 50,000 shares of the treasury stock purchased in May be made available to certain of Schenley's executives for investment. This recommendation was approved by the Board of Directors.
Following the meeting, Rosenstiel, in a conversation with the treasurer of Schenley, suggested that 25,000 treasury shares be sold to Leban, and it was agreed that the price of such sale should be fixed with Leban at that time. On the same day, Rosenstiel and Leban reached an agreement, subject to the approval of the Board of Directors, that Schenley would sell and Leban would buy 25,000 shares of the treasury stock at the closing market price on June 27, 1950. That price was $331/8 per share.
On August 4, 1950, Rosenstiel presented to the Board a draft of an agreement between Schenley and Leban. The draft of agreement provided that Schenley would sell 25,000 of its treasury shares at $331/8; that Leban was to pay $100,000 in cash on account and give his note for the balance of the purchase price, payable in 19 installments; and that Schenley was to hold the 25,000 of its own shares as security for the note. It was pointed out by counsel that Section 36 of the Delaware Corporation Law, Rev.Code 1935, § 2068, prohibited Schenley from taking its own stock as security for the debt. The Board thereupon authorized the execution of a substantially similar stock purchase agreement with Leban which, in the opinion of counsel, did not violate any provision of the Delaware Law.
On August 22, 1950, the stock of Schenley was split on a basis of 5 shares of new stock for 4 of old. Since the $331/8 price to Leban had been fixed in terms of the old stock, it was automatically prorated to give effect to the split up on the basis of 4/5 of $331/8 or $26.50 per share.
The revised agreement with Leban was completed at the end of August and initialled. It was formally executed on November 2, 1950. Pursuant to the resolution of the Board of Directors approving the execution of the agreement, it provided that a majority of Schenley stock should approve it before it should become effective. The approval of a majority of the stock was obtained at the regular meeting of stockholders in December, 1950 when 2,717,055 shares voted in favor of the contract and 241,220 voted in opposition.
The contract thus entered into between Schenley and Leban requires Leban to purchase 20,000[1] shares over a period of 20 years. He is required to purchase 3,750 shares one week after the contract has been approved by the stockholders and after Leban has disposed of his stock interests in the wholesale liquor business he formerly had conducted. At intervals of *609 two years, Leban is required to purchase 1,625 shares until the total of 20,000 shares is taken up. All of the purchases are to be made at the price of $26.50 per share. In addition, the agreement requires Leban to dispose of his interest in the wholesale liquor business on or before November 2, 1951.
Upon the default of Leban in making a required purchase for a period of 10 days, he is obligated to purchase the undelivered balance of the stock within 60 days. If Leban dies or terminates his connection with Schenley, Leban or his estate is obligated to purchase the entire undelivered balance of the stock within 2 years. Leban covenants that he is purchasing the stock for investment purposes and not for resale.
The plaintiff attacks the contract on the ground that it is inequitable and unfair to Schenley and its stockholders. He points to the market price, $347/8, of Schenley stock on November 2, 1950; to the rise in the net worth of Schenley from approximately $65,000,000 in 1941 to $213,858,407 in 1950; to the book value of Schenley stock on August 31, 1950 of $49.76, and to the favorable record of earnings of Schenley, as facts supporting his contention that the contract is unfair to Schenley.
The plaintiff in his brief relies upon Rosenthal v. Burry Biscuit Corp., Del.Ch., 60 A.2d 106 in support of the argument that the contract with Leban is inequitable and unfair to the corporation and its stockholders. In the Rosenthal case, this court had before it an option to purchase stock of the corporation for a period of 10 years. The optionee was the president of the corporation and dominated its Board. He was under no obligation to buy the stock subject to the option. The price at which the option was to be exercised was less than the then market value of the stock. At the time the option was granted, he was receiving substantial payment for his services to the corporation, consisting of a salary plus a percentage of the profits. He was not contemplating leaving the employ of the corporation. Under these circumstances, it was held that a controlled Board of Directors had given away valuable property of the corporation to the person controlling the Board without the corporation having received in return any consideration for the gift.
The plaintiff in the case at bar argues that, while the agreement with Leban is in the form of a contract, nevertheless in reality it is nothing more than an option given Leban to purchase the stock. This argument is predicated upon the provision of the Leban contract providing that, in the event of the default of Leban, he is required to purchase all of the unpurchased balance of the 20,000 shares. Plaintiff points out that by a deliberate default Leban could acquire the entire block of 20,000 shares prior to the expiration of the 20 year period.
Assuming that plaintiff's argument in this respect is correct and that the agreement with Leban is nothing more than an option, a conclusion which seems doubtful to me, nevertheless the Rosenthal case is not authority for the illegality of the Leban agreement.
Implicit in the Rosenthal case is the recognition that had there been consideration passing from the optionee to the corporation, the option would have been enforceable, absent circumstances which would have so shocked the conscience that to enforce the contract would have been patently inequitable.
In the case at bar, there is consideration to Schenley. Leban agrees to purchase at the market price on the day the agreement was reached. It seems clear from the affidavits that Leban would have left the employ of Schenley had not an agreement of the nature before me been forthcoming. It also appears from the affidavits, and is not controverted by counter-affidavits, that Leban was valuable to Schenley and that, in the business judgment of Schenley's Directors  who, parenthetically it may be observed, were in no way dominated by Leban  it was necessary for the best interests of Schenley to retain Leban in its employ. Finally, of prime interest to Schenley was Leban's covenant to divest himself of his interest in the wholesale liquor business which he had *610 been engaged in prior to his return to Schenley's employ and which he had retained as a safeguard against the failure to acquire a proprietary interest in Schenley. The divestment by Leban of his interest in a business to which he could return was assurance to Schenley that he would remain in Schenley's employ, a fact which up to the time of the execution of the contract was in doubt. Under these circumstances, I think it can hardly be seriously contended that the agreement with Leban can be said to have been without consideration. Whether the agreement be considered as a firm commitment to purchase or as an option to purchase, it is supported by consideration.
Nor do I think that the carrying out of the agreement can be said to be so unconscionable or inequitable that it must be enjoined. It is true that on November 2, 1950 Schenley stock had a market value of approximately $8.00 more than Leban had agreed to pay for it, but that fact, under the circumstances of this case, does not preclude enforcement of the contract. This is an incentive contract to induce a valued employee to remain with the company. While, in a sense, Schenley is losing an asset if it carries out the agreement, yet, that in itself is not inequitable if the value of the asset bears a reasonable relation to the value of the retention of the services of Leban. The facts, as far as they now appear, do not show that the relationship of value was unreasonable. Cf. Clamitz v. Thatcher Mfg. Co., 2 Cir., 158 F.2d 687, certiorari denied 331 U.S. 825, 67 S.Ct. 1316, 91 L.Ed. 1841; Wyles v. Campbell, D.C., 77 F.Supp. 343; Wise v. Universal Corporation, D.C., 93 F.Supp. 393.
The question was one calling for the exercise by the Directors of Schenley of business judgment. It is unquestionably the rule that courts will not undertake, in the absence of fraud, to review the exercise by a corporation's Directors of their business judgment as to what is required for the best interests of the corporation. Mercantile Trading Co. v. Rosenbaum Grain Corp., 17 Del.Ch. 325, 154 A. 457; Davis v. Louisville Gas & Electric Co., 16 Del.Ch. 157, 142 A. 654.
While the contract price for the stock to be sold Leban is less than the present market of that stock, it is to be pointed out that the price is fixed by the market price on the day of first agreement and is in fact more per share than was paid by Schenley for the stock. Furthermore, the stock is treasury stock and, as such, its price may be fixed by the Board of Directors in the exercise of its business judgment and, again, in the absence of fraud the courts will not interfere with the fixing of such price by the Directors. Belle Isle Corp. v. MacBean, Del.Ch., 61 A.2d 699.
It is the well settled rule of this court that a preliminary injunction will not issue unless it is apparent that there is reasonable probability of the plaintiff's ultimate success upon final hearing, or that the failure to issue a preliminary injunction will work irreparable injury. With respect to the former, I am of the opinion that if the facts appearing in the pleadings and affidavits were established at the final hearing, a permanent injunction would be refused. At the present stage of the case, these facts are not contested and, accordingly, it does not appear to me, at the present juncture, that there is reasonable probability of the plaintiff's ultimate success.
With respect to the possibility of irreparable injury resulting, I point out that Leban may not make the initial purchase of stock until one week after he has disposed of his interest in his wholesale liquor business. It appears in the record that this will take a substantial amount of time. Finally, Leban covenants not to resell any of the shares for a period of a year following their acquisition. The probability is that long before the happening of either of these two events, this case could be disposed of on final hearing.
The motion for a preliminary injunction is denied.
NOTES
[1] The number of shares was reduced from 25,000 to 20,000 at Leban's request.